Myers v. Hauger.

---

MYERS *et al.* v. HAUGER *et al.*, *Appellants.*

1. **Wills** : UNDUE INFLUENCE : EVIDENCE. In determining whether a a will was the result of undue influence, it is proper to consider the mental and physical condition of the testator, and the will itself may be read to the jury ; the question should be determined in the light of all the circumstances.

2. ——— : ———. In trying the validity of a will, where the evidence of undue influence is conflicting, it is proper to tell the jury that a person of a disposing mind has the right, under the law, to dispose of his property, by will as he sees fit and proper.

3. ——— : ——— : INSTRUCTION. Where the evidence of undue influence is weak, the instructions defining it should be clear and free from all doubt. To say that undue influence means influence of an improper kind is insufficient.

4. ——— : ———. Where there is no evidence of fraud or deception practiced upon the testator, a will ought not to be set aside for undue influence of his wife and sons, until it is shown, that, considering the state of the testator's mind, the influence was of such a degree as to destroy his free agency and make the will theirs and not his.

5. ——— : DISPOSING MIND. One who has sufficient understanding and intelligence to transact his ordinary business, and to understand what disposition he is making of his property and to whom he is giving it, is possessed of a disposing mind.

*Appeal from Clinton Circuit Court.*—HON. C. T. GARNER, Special Judge.

REVERSED AND REMANDED.

VOL. 98—28

*S. H. Corn* and *T. E. Turney* for appellants.

(1)   A jury must first determine, independent of the mental and physical conditions of the testator, the will and its provisions, whether undue influence was in fact used.   It is only after determining this to their satisfaction that they may look into the mental and physical conditions of the testator, and the provisions of the will to determine whether the undue influence, found to have been used, was used with effect.   *Sunderland v. Hood,* 84 Mo. 293 ; *Eckert v. Flowry,* 43 Pa. St. 52 ; *Monroe v. Barclay,* 17 Ohio St. 302; *Brinkman v. Rueggesick,* 71 Mo. 553.   (2)   It is not every influence which causes a man to make a different disposition of his property than he intended which will vitiate a will.   *Brinkman v. Rueggesick,* 71 Mo. 556 ; *Sunderland v. Hood,* 84 Mo. 296-7.   The influence must be such as " constrains him to do that which is against his will." Jarman on Wills, ( 2 Amer. Ed.) ch. 3, par. 36.   And it must result in a bequest in favor of the party exerting the influence.   *Ib.*

*Hiram Smith, Thos. J. Porter* and *J. F. Harwood* for respondents.

1)   The jury were the sole judges of what facts the evidence established.   (2)   " The result of the best considered cases upon the subject seems to put the *quantum* of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should, at the time of executing the will, know and understand what he was about.   1 Redf. on Wills, 124 ; *Jackson v. Hardin,* 83 Mo. 180.

BLACK, J.—This is a suit to contest the will of William Hauger on the ground that he was not of a

sound and disposing mind, and that it was procured by the undue influence of his wife and three of his sons.

By the will the deceased gave to Mrs. Myers and Mrs. Smith, both married daughters, one dollar each. They and their husbands are the contestants. Two sons and one daughter were non-residents, and to each of them he gave one dollar. He gave to his son William H. the sum of one hundred and fifty dollars. The balance of his personal property he bequeathed to his wife, with power to sell the same; and he devised the real estate, some two hundred acres, to his wife for life, with remainder to the two remaining sons, namely, Andrew D. and Jonathan. These sons resided with their father and carried on the farm under his directions. William H., the older brother, resided in the neighborhood. These three sons, namely, William H., Andrew D. and Jonathan, and their mother are charged with having procured the will by undue influence.

The deceased was about seventy years of age. The will was executed on Friday, December 5, 1884, between ten and eleven o'clock a. m.; he died on the following Sunday morning. He received a fall, some two years before his death, from which he did not entirely recover. At the time of executing the will, he suffered from paralysis of the bladder, so that the physicians were obliged to use a catheter. Mr. Myers, one of the subscribing witnesses, knew the deceased for more than twenty years before his death. This witness says: "When he signed the will, I think he was clear minded. I know he had no fever. Mr. Jones was late getting there and Mr. Hauger became uneasy. He said to me: 'I have worked hard for what little I have and I intend to do what I please with it.' When the will was read to him he corrected his name. He was a man who would have his own way. He was a firm man. He was sitting up on the bedside when he signed the will. There was no one present in the room when he was

dictating the will but Mr. Corn, who drew the will, and the two witnesses, myself and Mr. Jones. He dictated the whole will, no suggestions were made to him by any one. He gave all the directions and named all the children. When it was concluded he had his wife called and he told her to bring him his money. She brought a box to him in which there were some papers, and he took from it the money and paid Mr Corn for writing the will. When he had done he said: 'This will stop Bill Myers from blowing.' He did not talk loud or plain."

Dr. King, who saw the deceased on the night of the third and again on the evening of the fifth of December, 1884, testified: "I examined him closely on the first visit and again on the second, but not so closely. The last time I saw him he was very feeble. I questioned him and he answered rationally. I considered his mind sound. He was capable of comprehending the extent and character of his property. He was weaker and sinking. From my knowledge of him on the fifth day of December, 1884, I thought him of sound mind, but in his weakened health his mind was not as strong. When I got there he was laboring under the effects of an opiate. He was stronger on the evening of the third than of the fifth."

The substance of the evidence of the two daughters, who are contestants, is, that they arrived at their father's house on Thursday; that he did not know them until they had removed their wraps; that from Thursday night on he was not rational. Mrs. Myers testified: "I knew nothing about a will until I saw Mr. Corn there, then it struck me that that was what he came for. Polk went to the foot of the bed and said, 'Pap, you can't make a will until Tom Jones comes.' Polk came out and told Dick to go after Mr. Jones. They did not do anything until Mr. Jones got there. I caught Polk, Dick and mother talking together, and I said, 'Polk,

what does this mean, aggravating father in his dying hour about his will?' This was on Friday morning before the will was made. I was not opposed to having a will made. I told them they could have all his property if they would let him die in peace. Polk said, 'It don't make any difference what you say, there's got to be a will made.' "

The evidence of some of the neighbors, who were in on Thursday and Friday evenings, is that the deceased was then very low, paid no attention to what was going on around him, and was not in a fit condition to transact any business. There is some other evidence to the effect that the two boys desired their father to make a will prior to his last illness, and that he stated to other members of the family that the law made a will good enough for him. There is much other evidence in the case, but that given is sufficient to show its scope and character.

The court, at the request of the plaintiffs, gave these instructions :

"2. The court instructs the jury that in determining whether undue influence was used to procure the execution of the paper writing offered as the last will of William Hauger, they will take into consideration his mental and physical condition at the time of executing it, the will itself and the provisions therein.

"3. The jury are instructed that undue influence, as used in the instructions, means influence of improper kind exerted by the beneficiaries charged in the petition, or either of them, for the purpose of inducing the execution of the will which operated in the mind of Wm. Hauger so as to cause him to make a different disposition of his property than he would have made if free from such influence, and in determining whether such influence was exerted, the jury are to consider all the facts and circumstances in evidence."

1. The objection to the second instruction is that the question of undue influence must be determined without any regard whatever to the mental or physical condition of the testator, and without any regard to the provisions of the will. The authorities cited do not support the objection. On the contrary it is said in one of them: "Undoubtedly, if the mind of the testatrix was weak, it required less influence to control her will than it would have required to control the will of one whose mind was in full vigor. But neither moral nor physical constraint is to be inferred from mental weakness alone." *Eckert v. Flowry*, 43 Penn, St. 52. It needs no argument to show that it takes less persuasion or coercion to overcome a weak mind than it does a strong one. In determining whether the will was the result of over influence, it is entirely proper to consider the mental condition of the person upon whom the influence is alleged to have been exerted. And, as the physical condition has much to do with the mental, the physical condition of the testator may also be considered. So the will itself may be read to the jury, for they must determine the question of undue influence in the light of all the circumstances. The result may be considered in endeavoring to find the cause. It is usual, in cases circumstanced as this one is, to tell the jury in plain terms that a person of a disposing mind has the right, under the law, by will, to dispose of his property as he sees fit and proper. Such an instruction might have been given in this case. We see no valid objection to the second instruction.

2. But the third instruction cannot stand the test of the law. It is to be observed that the evidence of undue influence is very weak, barely sufficient to call for the submission of the issue. In such a case the instructions defining undue influence should be clear and free from all doubt. To say that undue influence means influence of an improper kind is no definition at all. It must confuse rather than aid the jury. Nor do

the added words, " so as to cause him to make a different disposition of his property than he would have made, if free from such influence," cure the defect. It is not true that any influence which causes a man to change or modify his will, will render it invalid. Says a respected author : " This question has been very extensively discussed, in many of the American courts, and it is clearly established, by many cases, in different states, that the influence of a child, or wife, or of a friend, if exerted, in a fair and reasonable manner, and without deception or imposition upon the testator, and while he had capacity to deliberate, and estimate the inducements offered, will not avoid a will, when made in favor of such party." 1 Red. on Wills, *527. Such is, in effect, the result of our own decisions. *Rankin v. Rankin*, 61 Mo. 295 ; *Jackson v. Hardin*, 83 Mo. 184 ; *Rule v. Maupin*, 84 Mo. 587. There is no evidence of fraud or deception practiced upon the testator ; and in view of the fact that there is no such evidence, the will ought not to be set aside for undue influence of the wife and sons, until it is shown that, considering the state of mind of the testator, the influence was of such a degree as to destroy the free agency of the deceased, and make it their will and not his will.

3.   If William Hauger had sufficient understanding and intelligence to transact his ordinary business affairs, and understood what disposition he was making of his property and to whom he was giving it, then he possessed a disposing mind. *Benoist v. Murrin*, 58 Mo, 322 ; *Jackson v. Hardin, supra.* This is substantially the rule laid down by the court in the instruction given upon this subject. An objection is made to the instruction, but it goes to the form rather than to the substance. The instruction can be readily changed to avoid the objection.

The judgment is reversed and the cause remanded. All concur.