RIGGIN et al., Appellants, v. BOARD OF TRUSTEES OF WESTMINSTER COLLEGE et al.

### Division Two, March 12, 1901.

1. **Testamentary Capacity: MISSOURI RULE.** The rule in this State is, that one who is capable of comprehending all his property and all persons who reasonably come within the range of his bounty, and who has sufficient intelligence to understand his ordinary business, and to know what disposition he is making of his property, has sufficient capacity to make a will.

Riggin v. Westminster College.

2. ———: PRESUMPTION: PRIMA FACIE CASE. The law indulges the presumption that the testator was possessed of a sound and disposing mind. And where the formal execution of the will according to the requirements of the statute is shown, and the subscribing witnesses testify to the sanity of the testator, and he is of proper age to make a will, a prima facie case in favor of the proponents of the will is made out, and the burden of proof rests on the contestants to overcome this presumption by persuasive evidence.

3. ———: ———: ———: HOW OVERCOME. The advanced age of the testator (seventy-four), his feebleness, the fact that he gave his large estate to his wife for life with the remainder to a college, to the exclusion of his nearest of kin (children of a half brother), do not overcome this presumption or prima facie case, nor do they constitute any substantial evidence of a want of testamentary capacity.

4. ———: CASE STATED: DEMURRER. The testator wrote his own will at home in the presence of his wife, who knew all about it. It was witnessed at a bank by personal friends whom he had known for many years. It was prepared when he was about seventy-four, nearly three years prior to his death. He was then thin and fragile, but vigorous as most men of his age. He gave his wife a lifetime interest, and the remainder to a college endowment. He had no children, and his nearest kin were children of a deceased half brother, who lived in California, and were in comfortable circumstances. He had been prominent in business for many years, and numerous witnesses testified that he was "a level-headed business man, very intelligent." To overcome this prima facie case, the contestants, the said next of kin, introduced evidence that testator was "a queer man," that "he looked really funny," that "he talked kind of funny," that "he seemed to be suffering from some cause," that "he said he was making plug for a rupture on his body," that "he was very keen in his expression," that "he was afflicted with bowel trouble." that "he complained of headache-vertigo," that "years ago he had fits of frenzy," that forty-five years before his death he complained of being impotent, that he used intoxicating liquors, that he once lost a hundred dollars in a poker den, about which he cried, but got his money back, that he pressed his debtors for money, was miserly, had been a dyspeptic, that when he loaned money he would have the notes made payable to other persons and then indorsed to him to keep from paying taxes on them, etc. *Held*, that all this was no evidence at all, and the court properly sustained a demurrer to the contestant's case.

Appeal from Hannibal Court of Common Pleas.—*Hon. Reuben F. Roy,* Judge.

AFFIRMED.

*J. L. RoBards, W. M. Boulware* and *T. H. Bacon* for appellants.

(1)   The evidence substantially tends to show for the time being general disablement of testamentary volition at the occasion of the alleged will, combining with symptoms of acquired mental enfeeblement the symptoms of mental perversion.   Am. Bible Soc. v. Price, 115 Ill. 642; Ins. Co. v. Rodel, 95 U. S. 232; Ins. Co. v. Broughton, 109 U. S. 121. (2)   Mere eccentricity is not insanity, and yet eccentric feats may be a symptom of insanity.   Schouler on Wills (2 Ed.), secs. 188 and 152; Bristead v. Weeks, 5 Redf. 529; Miller v. White, 5 Redf. 320.   (3)   Persons partially insane are usually, not to say always, in a high degree eccentric in their general conduct.   Hence it is that general eccentricity, as the common coincident being proved, assists materially in the proof of partial insanity.   Shelford on Lunatics, p. 47; Hadfield's trial, 27 How. St. Tr. 1313; Dew v. Clark, 3 Add. Eccl. Rep. pp. 79, 182, 192 and 193.   (4) The testator was subject to attacks of temporary mania in which he manifested ungovernable fury.   Dr. Hammond says that one of the characteristics of monomania is that the monomaniac has the power to conceal his delusions and to arrest the paroxysms of delirium to which he may be subjected. Hammond on Insanity; Schouler on Wills, (2 Ed), p. 154; 1 Wharton & Stille Med. Jur., sec. 60.   Sausser's derangement was well revealed by the bursts of ungovernable fury in which he tortured his unfortunate slave.   Morbid irritability is one symptom of paretic dementia.   Spitzka Man. Ins.,

188x; Dew v. Clark, 3 Add. Eccl. Rep. 79, pp. 106, 107. (5)  These various instances show material wholly unlikely to leave a will devoted to pious or religious uses.  In money matters his was a life not of mere eccentricity.  If he was not in these matters entirely irresponsible, his was a life of habitual felony, leaving the ministry forgotten except in his will.  Drexel v. Tyrrell, 15 Nevada, 114 and cases cited. (6)  The only witnesses who expressed the opinion that Mr. Sausser was of sound mind, were J. H. McVeigh on cross-examination, and W. S. Snyder, subscribing witness.  The ex parte affidavit of proof is to same effect.  Mrs. Sausser's admissions vouched for the non-impairment of his powers and full possession of his faculties and powers.  Subscribing witnesses are not always the best. Irish v. Smith, 7 Serg. and R. 90; McTaggart v. Thompson, 14 Pa. St. 154.  Their opinion is no more cogent than that of a non-subscribing witness. Turner v. Cheeseman, 15 N. J. Eq. 243; In re Blood Estate (Vt.), 19 Stl. 770; Taylor v. Trick, 165 Pa. St. 586.  With one exception all these Missouri witnesses spoke from their neighborship extending through a great many years.  All gave instances of their personal experience factoring in the evolution of their opinions.  Baldwin v. State, 12 Mo. 223; Crowe v. Peters, 63 Mo. 434; Moore v. Moore, 67 Mo. 195; Appleby v. Brock, 76 Mo. 314; State v. Williamson, 106 Mo. 162; Sharp v. Railroad, 114 Mo. 100; State v. Wright, 134 Mo. 404; Turner v. Railroad, 23 Mo. App. p. 20.  Unsound perversion on one or a few subjects entirely consists with and frequently, if not generally, accompanies extraordinary business tact, talent and success.  Redfield on Wills, sec. 9, note 8; Shelford on Lunatics, p. 43; 3 Wharton & Stille Med. Jur., p. 295; 1 Underhill on Wills, p. 117, sec. 90; Browne's Med. Jur. Insane, p. 553, sec. 386; Johnson v. Moore's Heirs, 1 Littell, 371; Thompson v. Thompson, 21 Barb. 107; Shaw's Will, 2 Redf. 107.

*F. L. Schofield, H. S. Priest* and *Geo. A. Mahan* for respondents.

(1)   The court properly took the case from the jury. There was no substantial evidence tending to show testamentary incapacity.   Maddox v. Maddox, 114 Mo. 35; McFadin v. Catron, 120 Mo. 252; Jackson v. Hardin, 83 Mo. 175; Norton v. Paxton, 110 Mo. 456; Cash v. Lust, 142 Mo. 630; Fulbright v. Perry County, 145 Mo. 432; Sehr v. Lindemann, 153 Mo. 276; Von de Veld v. Judy, 143 Mo. 348; Brinkman v. Rueggesick, 71 Mo. 553; Benoist v. Murrin, 58 Mo. 307. (2)   There was no error in excluding testimony.   Even had it been admitted, the excluded evidence would not have tended to prove testamentary incapacity.   This sufficiency appears even in the statement in appellants' brief as to the nature of the excluded evidence.   It is made more obvious by an examination of the record referred to taken in its context.   (3) Any verdict in this case, finding that Sausser did not possess testamentary capacity when he made this will, must have been set aside; this being so, the judgment should be affirmed, even although the court may have erred in some of its rulings at the trial.   Norton v. Paxton, 110 Mo. 466.

BURGESS, J.—This is a proceeding under the statute to contest the validity of the will of William Sausser, who died on the fourteenth day of January, 1892, at the advanced age of seventy-seven years.

The validity of the will is assailed upon various grounds set forth in the petition, including undue influence in the procurement of the execution of the will, by his wife, Adelaide Sausser, and the want of mental capacity in the testator to make a will.   The trial court excluded all other questions, and confined the issues to the single one as to whether there was in fact a will or not.

The proponents having made due proof, by the subscribing witnesses to the will, of its proper execution, and of the sanity of the testator at the time of its execution, read the will in evidence and rested.

The testator left no children.    The contestants are the son and daughter of a deceased half brother, who at the time of the execution of the will, lived in the city of Los Angeles, California, and were in moderately affluent circumstances. The will is a holographic one, having been written by the testator on the thirteenth day of February, 1889, about two years and eleven months before his death.    By it, he disposed of his large estate by providing for his funeral expenses, and the erection of a monument at the graves of himself and wife, and then bequeaths and devises to her, should she survive him, the homestead estate for life or widowhood, with all the property thereon, absolutely, and an annuity of twenty-five hundred dollars per annum to be paid her in two equal sums semiannually.    The remainder of his estate, subject to the annuity, is given to the Board of Trustees of Westminster College, in trust for the endowment of theological professorships and scholarships as therein provided for and directed.    His wife survived him and is one of the defendants to this suit.    She knew perfectly well how her husband was disposing of his property while he was preparing his will, and fully approved of its provisions.

Immediately after its execution the testator and his wife made a visit to the plaintiffs in California.

While the evidence shows the testator to have been a tall, spare man of delicate constitution, it also shows him to have been a man of indomitable energy, of extraordinary intelligence, and of shrewd business capacity.    He took much care against exposure, and very rarely required the services of a physician, and had not had one for four or five years before

his last illness.    He continued the management of his large business interests as he was accustomed to do down to and within a few days before his death.

For the purpose of showing the want of mental capacity in the testator to make the will, plaintiffs introduced evidence that the testator was a queer man, that he looked "really funny," that "he talked kind of funny," that "he seemed to be physically weak, his eyes seemed to be suffering from some cause," that he said "he was making plug for a rupture on his own body," "that he was very keen in his expression," "he was afflicted with bowel trouble," "he complained of headache-vertigo," "years ago he had fits of frenzy," that some forty-five years before his death he complained of being impotent, the use of intoxicating liquors, losing a hundred dollars gambling in a poker den, about which he cried, but got his money back, he pressed his debtors for money, was miserly, had been a dyspeptic, when he loaned money he would have the notes made payable to other parties and then indorsed to him to keep from paying taxes upon them, that he thought it was right and proper for a person to keep from paying taxes upon his property if he could, delusions as to inventions, cruelty to an inoffensive slave, and other matters of a similar character which are unnecessary to mention, and the fact that he gave his large estate, said to be worth $150,000, to his wife and a stranger, and disinherited his only heirs at law, the children of a half-brother, John Riggin.

At the close of all the evidence the court, over the objection and exception of plaintiffs, instructed the jury that under the pleadings and the evidence the verdict must be for the defendants, and the jury having so found, plaintiffs in due time filed their motion for a new trial, which being overruled, they appeal.

There have been three printed briefs filed by counsel for

plaintiffs in this case, containing in the aggregate two hundred and forty pages, and while there are only thirteen assignments of errors in the original brief these are discussed under eighty-four separate and distinct heads with marked ability, and in a manner which shows great research.    But we shall not undertake to follow them in their order, for we are not inclined to believe that it would subserve any useful purpose to do so, or that it is at all necessary to a proper disposition of the case from a legal standpoint.

It is argued that the testator had not the testamentary capacity to make a will at the time of the execution of the one in contest, and in support of this contention a large number of incidents of a peculiar and eccentric character heretofore specified which occurred during the last forty to fifty years of his life, are largely relied upon.

In passing upon the same character of evidence in Cauffman v. Long, 82 Pa. St. 72, which was a will contest, it was said:

"There was serious error in submitting the question of testamentary capacity to the jury at all.    The learned judge should have withdrawn it altogether.    At most there was but a scintilla of proof.    The evidence of the defendant upon this point amounts to nothing.    One witness, Kirk Haines, swears that he thought the testator was a weak-minded man, because when he came to the store with his wife, he allowed the latter to do the bargaining and never interfered.    Sheriff Rinehart thought he was a monomaniac, because he told his pastor, with whom he appeared to have had some difficulty, that, 'We want one to preach Christ and Him crucified, and not for money, money, all the time, as you do.'    Also, that at a church meeting there was a dispute about the control of the church property. During the controversy Shimp, the minister, said, 'This was God's house.'    Cauffman replied: 'It is not your house, nor

God Almighty's house. It is my house. I built it.' This was not perhaps exactly orthodox, but when it is remembered that the testator, as was alleged, gave the lot and materially aided in building the church, it hardly shows testamentary incapacity. Upon another occasion, he expressed to the witness, Rinehart, his aversion to going to law, and thought he could not get justice. Abraham Long, another witness, says he thought his mind was wandering from the fact that when the witness made some remark about the time of day he merely said, 'Hunck?' and that when he asked him where the women were, he said, 'Was sag't?' and looked queerly. Isaac Wright thought he was not sound in his mind because he would not decide upon selling the witness his crop of grain. These are all the witnesses upon this point whose testimony is worth noting. I have not, of course, given all they said. What I have quoted is a fair specimen. We look in vain through the evidence for anything like insanity or delusion. A court has a higher duty to perform than merely to answer points of law. It is its duty to see that the law is faithfully administered. Such administration requires that a man's will, the most solemn instrument he can execute, shall not be set aside without any sufficient evidence to impeach it. There is no redress here for an erroneous or improper verdict. But where a case is submitted to a jury upon clearly insufficient evidence, such as no court ought to sustain a verdict upon, it is our plain duty to reverse."

Upon this question it would be difficult to find an adjudged case more like the one at bar in regard to this character of evidence, than the Chafin Will case, 32 Wisconsin, 557, and it was therein held that giving the evidence its fullest effect, the mental peculiarities and eccentricities of character and conduct of the testator thus shown were not sufficient evidence of testamentary incapacity to justify a submission of the case to the jury.

Again in case of the Will of J. B. Smith, 52 Wis. 543, it was ruled that although the testator displayed some eccentricity of character, and was a believer in the power of the spirits of deceased persons to communicate with the living, he was not for that reason insane.

And in the case of Fulbright v. Perry County, 145 Mo. 432, we held that eccentricities of character in the testator, mental peculiarities, unusual conduct in the manner of cultivating his farm and in managing his property, and in living the life of a recluse, aloof from his relatives, did not establish an unsound mind, or show the testator to have been incapacitated to dispose of his property by will.

As was said in Cauffman's case, supra, this evidence amounts to nothing.

The rule in this State is, that one who is capable of comprehending all his property and all persons who reasonably come within the range of his bounty, and who has sufficient intelligence to understand his ordinary business, and to know what disposition he is making of his property, has sufficient capacity to make a will. [Benoist v. Murrin, 58 Mo. 322; Jackson v. Hardin, 83 Mo. 175.] And the law indulges the presumption that the testator was possessed of a sound and disposing mind, and where the formal execution of a will according to the requirements of the statute is shown, as was done in the case at bar, and the subscribing witnesses testify to the sanity of the testator, and he is of proper age to make a will, a prima facie case in favor of the proponents of the will is made out, and the burden of proof rests upon the contestants to overcome this presumption by persuasive evidence. [Jackson v. Hardin, supra; Maddox v. Maddox, 114 Mo. 35; Carl v. Gabel, 120 Mo. 283; McFadin v. Catron, 138 Mo. 197; Fulbright v. Perry County, 145 Mo. 432; Sehr v. Lindemann, 153 Mo. 276; Tibbe v. Kamp, 154 Mo. 545.]

Now all the evidence there was worthy of note to over-come the presumption of the testamentary capacity of the testator and this prima facie case, aside from that which we have said was no evidence at all, was the advanced age of the testator, his feebleness, the fact that he gave his large estate to his wife and a stranger, to the exclusion of his nearest of kin. This all falls far short, in our opinion, of showing want of testamentary capacity in the testator to make the will; indeed, is no substantial evidence tending to show that fact.

Moreover, the will was several days in preparation at the testator's house, while in his usual health, and in the possession of his mental faculties. It was executed in the Farmers and Merchants Bank at Hannibal, and witnessed by personal friends whom he had known for many years. His wife knew all about the provisions of the will, and is entirely satisfied with its provisions. She testified that he was thin and fragile, but was as vigorous as most men of his age and form. The evidence showed that he was a prominent business man from 1872 to the time of his death, always attending to his own business, of strong vigorous mind, and a very capable business man. As one witness put it, "A pretty nice old gentleman to talk to, intelligent, bright and active;" and by another, "A man above the average in business ability;" "a level-headed business man, very intelligent;" by another, "I think he was a very intelligent man;" by another, "He always impressed me as being a man of very sound mind, and I thought very shrewd in business-matters, more than the average;" and by still another, "A rare man so far as his capacity to do business was concerned, very few equals."

Our conclusion is that the testator was entirely competent to make the will.

There was no reversible error we think in the exclusion of testimony. If men's wills are to be broken under the cir-

cumstances disclosed by this record, it is difficult to tell under what circumstances a will would have to be made, in order to withstand the assaults of disappointed heirs.

Even if the case had gone to the jury and they had found that the instrument of writing in contest was not the will of William Sausser, it would have been the plain duty of the trial judge to set aside the verdict as unsupported by the evidence, and under such circumstances, it was his duty and prerogative to interfere before submission, and direct a verdict for defendants, the effect of which was to find that the writing proposed was the last will and testament of William Sausser. [Jackson v. Hardin, supra; Fulbright v. Perry County, 145 Mo. 432.]

Judgment affirmed.

*Sherwood, P. J.,* and *Gantt, J.,* concur.